# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ITEX, INC., et al. | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | No. 05 CV 6110 |
| | ) | |
| v. | ) | Wayne R. Andersen |
| | ) | District Judge |
| WESTEX, INC., et al. | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a motion by Defendants/Counter-Plaintiffs Westex, Inc. ("Westex"), King America Finishing, Inc. ("King America"), and Western Dyers & Finishers, Inc. ("Western," collectively "Defendants") for leave to file amended answer and counterclaims. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

This case involves U.S. Patent No. 5,468,545 (the "'545 Patent"), a patent for treated, flame resistant cotton blended fabrics. The '545 Patent was originally issued on November 21, 1995, and was subsequently confirmed by two reexaminations by the United States Patent and Trademark Office ("PTO") on July 17, 2007 and February 19, 2008. (Dkt. No. 1521-1).

Itex, Inc., ("Itex") and MF&H Textiles, Inc. ("MF&H," collectively "Plaintiffs") filed the instant lawsuit on October 21, 2005. Plaintiffs' complaint alleged that Westex was infringing on the '545 Patent by making or selling certain flame retardant cotton blended fabrics. Other defendants were subsequently added to the lawsuit, including King America, Western, Workrite Uniform Company Inc., VF Imagewear, Inc., Cintas Corporation, Unifirst Corporation, G&K Services, Aramark Uniform & Career Apparel, LLC, and Greenwood Mills, Inc.

On February 29, 2008, Plaintiffs initiated a second lawsuit in the Northern District of Illinois also involving alleged infringement of the '545 Patent (08 CV 1224).

On August 5, 2009, Defendants filed their first motion for leave to file amended answer and counterclaims (Dkt. No. 148), but that motion was withdrawn on September 18, 2009 (Dkt. No. 158). On September 25, 2009, Defendants filed a second motion for leave to file amended answer and counterclaims. Defendants seek to "add additional specific allegations that the ['545 Patent] was obtained through inequitable conduct." (Defs.' Second Mot. at 1). The inequitable conduct allegations contained in the proposed amended affirmative defenses and the proposed amended counterclaims are identical. Defendants assert that the motion resulted from recently discovered evidence, including depositions of the named inventors of the '545 Patent. *Id*. at 5. While some discovery has taken place, "Defendants anticipate that further fact discovery in this case, including third party discovery – which the parties have not yet begun because the case is in the claim construction phase – will unearth further evidence to support their inequitable conduct allegations." *Id*. Plaintiffs oppose the motion, arguing that the inequitable conduct counterclaim is insufficiently pled and unsupported by facts.

## LEGAL STANDARD

"To successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (internal citations omitted). These elements are distinct – "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Id*. at 1366 (quoting *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001)).

The Federal Circuit explained the pleading standard for inequitable conduct in *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009). "'Inequitable conduct, while a broader concept than fraud, must be pled with particularity' under Rule 9(b)." *Id.* at 1326 (quoting *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003)).

> [T]o plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO. Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

*Id.* at 1328-29.

Plaintiffs repeatedly suggest that *Exergen* requires Defendants to set forth allegations that the intent to deceive is the "single most reasonable inference" to be drawn from the facts. (Pls.' Opp'n at 2, 3, 4, 6, 8, 9, 14). We disagree. Deceptive intent must be the "single most reasonable inference" in order to meet the *clear and convincing* standard required to prevail on the *merits*, but at the *pleading* stage, an inference of deceptive intent simply must be "reasonable," meaning that it must be "plausible and [] flow[] from the facts alleged." *Exergen*, 575 F.3d at 1329, n. 5.

Pleading deceptive intent "on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.* at 1330. A court must be careful about drawing any permissive inference of deceptive intent, "lest inequitable conduct devolve into 'a magic incantation to be asserted against every patentee' and its 'allegation established upon a mere showing that art or information having some degree of materiality was

3

not disclosed.'" *Id*. at 1331 (quoting *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987)).

**DISCUSSION**

Defendants allege four instances of inequitable conduct by inventors James Green ("Green") and George Fleming ("Fleming"), and possibly others: (1) failure to disclose facts during the original prosecution of the '545 Patent, (2) failure to disclose facts during the reexamination proceedings for the '545 Patent, (3) failure to disclose information related to the Edge Burn Test, and (4) failure to disclose certain prior art. We address the specific arguments related to each of these allegations in the following sections, but first it is worth highlighting Plaintiffs' overarching primary objection to all of Defendants' allegations – namely, the manner in which Defendants allege intent to deceive.

For each allegation, Defendants allege deceptive intent "upon information and belief," and assert that only the inventors possess additional information relevant to their intent. (Defs.' Am. Affirmative Defenses ¶¶ 14-15, 35-36, 51-52, 63-64, 73-74, 81, 83; Defs.' Am. Counterclaims ¶¶ 30-31, 51-52, 67-68, 79-80, 89-90, 97, 99). According to Plaintiffs, each allegation of intent to deceive "is essentially a shorthand boilerplate allegation," and such "conclusory pleading fails the very basic requirements under Rule 9(b) and *Exergen*." (Pls.' Opp'n at 7). Responding to Defendants' repeated contention that only Green and/or Fleming possess additional information relevant to their intent, Plaintiffs argue that "this baseless allegation to suggest the Defendants' inability to plead any more specifics is disingenuous," because "defendants have already conducted extensive discovery," including deposing Green (twice) and Fleming. (Pls.' Opp'n at 8).

The standard for pleading deceptive intent, including a pleading based on "information and belief," is set forth in the preceding section, and that is the standard by which the court will evaluate the element of intent, as necessary, with respect to each of the following allegations of inequitable conduct.

I. **'545 Patent Original Prosecution**

Defendants' first allegation of inequitable conduct centers around Green's failure to disclose certain test results to the PTO. According to Defendants,

> Less than two months prior to filing the application that issued as the '545 Patent, Green performed tests using the '545 Treatment Process on a fabric sample having a fiber composition identical to an example disclosed in the '545 Patent that was represented as falling within the scope of at least claim 1, but the treated fabric sample that Green created had only 1.94% measured phosphorous by weight after five washes and twenty-four hours "emersion" in boiling water . . . .

(Defs.' Am. Affirmative Defenses ¶ 8; Defs.' Am. Counterclaims ¶ 24). As Defendants note, the 1.94% falls outside the range specified in claim 1, which is "at least 2.0% and no more than 3.0% phosphorous by weight of fabric." ('545 Patent, col. 8, lns. 41-44). According to Defendants, these facts supposedly "refute or are inconsistent with Green and Fleming's representations in the '545 Patent specification." (Defs.' Am. Affirmative Defenses ¶10; Defs.' Am. Counterclaims ¶ 26). Defendants assert that that these facts were material to the patentability of at least claim 1, but Green failed to disclose these facts to the PTO during the original prosecution of the '545 Patent. (Defs.' Am. Affirmative Defenses ¶¶ 9-12; Defs.' Am. Counterclaims ¶¶ 25-28).

This allegation is based on a misreading of claim 1 of the '545 Patent. Defendants refer to the "'545 Treatment Process," which they define as "the treatment process disclosed and claimed in at least claim 1 of the '545 Patent." (Defs.' Am. Affirmative Defenses ¶ 5; Defs.' Am. Counterclaims ¶ 21). It is clear from a full reading of this allegation that Defendants use the

phrase "'545 Treatment Process" to mean the specific single-pass process that was set forth in the specification of the '545 Patent.  As the court explained in its claim construction opinion dated July 20, 2010, the single-pass process set forth in the specification is merely one example of a process that can be used, but the details of that single-pass process are not part of the claim.  The '545 Patent is for a product that demonstrates the characteristics described in claim 1, regardless of the process used to achieve those characteristics.  Therefore, the simple fact that one sample of fabric was treated with the single-pass process described in the specification and did *not* ultimately demonstrate the characteristics set forth in claim 1 of the '545 Patent is irrelevant, because the single-pass process is not part of the claimed product.

Based on the foregoing, Defendants' motion for leave to file amended answer and counterclaims is denied with respect to the allegations set forth in paragraphs 5 through 15 of the proposed amended affirmative defenses and paragraphs 21 through 31 of the proposed amended counterclaims.

## II.     Reexamination Proceedings for the '545 Patent

In their second allegation of inequitable conduct, Defendants point to the reexamination proceedings for the '545 Patent.  In both the first and the second reexamination proceedings, the patentability of the '545 Patent was called in to question based on U.S. Patent No. 4,909,805 (the "'805 Smith Patent"), the concern being that "treating cotton blended fabrics with the methods disclosed in the '805 Smith Patent will inherently produce wash resistant durable blended fabrics having each of the limitations claimed in, at least, claims 1 and 3-5 of the '545 Patent."  (Defs.' Am. Affirmative Defenses ¶ 16; Defs.' Am. Counterclaims ¶ 32).  In connection with these reexamination proceedings, Green performed additional tests and issued supplemental declarations.  In his supplemental declaration dated November 20, 2006 (the "2006 Green

Declaration"), Green explained that, according to tests he performed, fabrics treated with the methods disclosed in the '805 Smith Patent met *some* limitations in claim 1 of the '545 Patent, but such fabrics "failed the Edge Burn test" and "had non-uniform distribution on a micro scale." (Defs.' Am. Affirmative Defenses ¶¶ 17-18; Defs.' Am. Counterclaims ¶ 33-34 (both citing the 2006 Green Declaration, p. 6, lns. 7, 15)). In his supplemental declaration dated May 18, 2007 (the "2007 Green Declaration"), Green described additional tests he performed, and concluded that "the fabric samples he treated with the methods disclosed in the '805 Smith Patent 'retained more than 3% phosphorous after 5 washes and 24 hour boil,' and therefore, 'they are outside the claim limit of 3%.'" (Defs.' Am. Affirmative Defenses ¶ 24; Defs.' Am. Counterclaims ¶ 40 (both quoting the 2007 Green Declaration at 7)). The PTO relied on these declarations in both reexaminations when it confirmed the patentability of the '545 Patent.

Defendants contend that Green misrepresented material facts and failed to disclose material information to the PTO concerning the testing he performed over fabrics treated with the methods disclosed in the '805 Smith Patent, including the following:

(a) Two treated fabric samples, 2F and 2H, were measured as retaining 2.95% and 2.96% phosphorous, respectively, which falls *within* the range claimed by the '545 Patent of 2.0-3.0%. After obtaining these measurements, Green retested the 2F and 2H samples, obtained higher measured phosphorous percentages, and then used averages of the initial and retested measurements in his report to the PTO, resulting in an amount above 3.0%, *outside* of the range claimed by the '545 Patent.

(b) Two other treated fabric samples, 4F and 4H, were measured as retaining *greater* amounts of phosphorous after the five washes and twenty-four hours emersion in boiling water than before they were subjected to that process, which is suspicious, because washing and boiling should *decrease* the amount of phosphorous in the fabric. However, unlike the 2F and 2H samples, Green did not retest the 4F and 4H samples, but rather reported those results to the PTO, even though the results were suspicious.

(c) The retained phosphorous amounts reported in the 2007 Green Declaration were *averages* of numerous phosphorous measurements Green obtained, rather than any one measurement actually obtained, but Green failed to disclose that these

7

>     amounts were averages, and that some individual measurements actually fell
>     within the claimed range of 2.0-3.0%.

(Defs.' Am. Affirmative Defenses ¶ 29; Defs.' Am. Counterclaims ¶ 45). "In sum, these facts allege that Mr. Green only retested results that tended to disprove Plaintiffs' position, but declined to retest results (including plainly suspicious results) that tended to support Plaintiffs' position." (Defs.' Reply at 7).

It is clear that these tests regarding the '805 Smith Patent were material, as the PTO relied on Green's declarations about these tests in confirming the patentability of the '545 Patent. Defendants have also sufficiently identified the specific "who, what, when, where, and how" of the material misrepresentation or omission, in compliance with *Exergen*. The issue is whether Defendants have sufficiently alleged intent to deceive the PTO.

As mentioned earlier, Defendants allege deceptive intent based "[u]pon information and belief," and contend that "[o]nly Green possesses additional information relevant to his intent." (Defs.' Am. Affirmative Defenses ¶¶ 35-36; Defs.' Am. Counterclaims ¶ 51-52). According to Defendants, "based on these allegations, at the very least, it is plausible and flows logically that Mr. Green possessed the requisite intent." (Defs.' Reply at 7).

In response, Plaintiffs argue that use of averages in reporting results is often routine, and "there are many plausible reasons for 'retests' and 'averaging' of scientific data," so "it cannot remotely be argued that intentional fraud is the single most reasonable inference to be drawn from these circumstances." (Pls.' Opp'n at 9). However, as discussed earlier, at the pleading stage, deceptive intent need only be a *reasonable* inference, not necessarily the *single most reasonable* inference. Based on the information contained in Defendants' affirmative defenses, Green's decision to retest unfavorable results but *not* retest favorable results that were suspicious could reasonably be seen as a deliberate decision to withhold material information from the PTO.

8

Plaintiffs also make the argument that since the reexaminations happened after this lawsuit was filed, the inventors and patent owners "obviously were acutely aware that their conduct of the reexaminations was under intense scrutiny from Defendants' counsel, which fairly touts itself to be one of the most sophisticated and aggressive law firms in the country," and "[i]t is simply not plausible that, standing center stage in the spotlights, these modest inventors and patent owners would devise a deliberate scheme to deceive." (Pls.' Opp'n at 14-15). Deliberate deception may not be the single most reasonable inference, but it certainly is "plausible," and for that reason, sufficiently alleged.

Therefore, Defendants' motion for leave to file amended answer and counterclaims is granted with respect to the allegations set forth in paragraphs 16 through 36 of the proposed amended affirmative defenses and paragraphs 32 through 52 of the proposed amended counterclaims.

## III. Disclosure of Edge Burn Test

In the third allegation of inequitable conduct, Defendants assert that "Green, Fleming and the owners of the '545 Patent failed to inform the PTO that their representations . . . regarding what it takes to 'pass' the Vertical Flame Test were not accurate." (Defs.' Am. Affirmative Defenses ¶ 45; Defs.' Am. Counterclaims ¶ 61).

> For example, Green, Fleming and the Patent Owners failed to inform the PTO that the referenced Vertical Flame Test specification (Federal Test Method 5903.1) requires that "afterflame time" be reported each time the Vertical Flame Test is performed and that most, if not all, standards that call for measurements from the Vertical Flame Test require that the fabric have no more than a specified measures maximum afterflame time in order for that fabric to pass the standard.
>
> Green and Fleming also failed to inform the PTO that passing the Edge Burn Test is not necessarily the same thing as passing the Vertical Flame Test because, among other things, Edge Burn Test does not require that afterflame time (or any similar measurement) be recorded.

(Defs.' Am. Affirmative Defenses ¶¶ 46, 47; Defs.' Am. Counterclaims ¶¶ 62, 63). Defendants contend that "Green and Fleming implied that the only important measurement recorded when performing the Vertical Flame Test is the measured 'burn length' of the fabric and that a fabric passes the Vertical Flame Test if it has a 'burn length of less than 15 cm (6").'" (Defs.' Am. Affirmative Defenses ¶ 39; Defs.' Am. Counterclaims ¶ 55).

In response, Plaintiffs state, "These allegations are completely irrelevant because there are no facts alleged on why afterflame is even material to anything that transpired during the prosecution of the patent-in-suit. The claims do not even recite a limitation calling for afterflame." (Pls.' Opp'n at 10). Plaintiffs continue, "Because there is no requirement relating to 'afterflame' in the claims, reporting to the Patent Examiner afterflame values or whether another test (not relevant to the claims) requires afterflame would have been wholly superfluous because a Patent Examiner would have no reason to consider afterflame information to judge patentability." (Pls.' Opp'n at 10).

We agree with Plaintiffs. Defendants simply assert that "a reasonable examiner would have considered these facts important to the patentability of at least claim 1 of the '545 Patent," (Defs.' Am. Affirmative Defenses ¶ 48; Defs.' Am. Counterclaims ¶ 64), but they provide no factual basis to support why this information would have been considered material. Contrary to what Defendants allege, there is no evidence that Plaintiffs tried to equate passing the Vertical Flame Test to passing the Edge Burn Test. Indeed, the specification explains in detail how the tests are distinct from one another. ('545 Patent, col. 4, ln. 34 – col. 5, ln. 27). Merely noting a correlation between the tests does not amount to an assertion that passing one test necessarily means passing the other. ('545 Patent, col. 5, lns. 2-3). Claim 1 references the Edge Burn Test,

but not the Vertical Flame Test. There is no need for the inventors to explain "afterflame" or any other details of the Vertical Flame Test, as that test is not pertinent to the claimed invention.

For these reasons, Defendants' motion for leave to file amended answer and counterclaims is denied with respect to the allegations contained in paragraphs 37 through 52 of the proposed amended affirmative defenses and paragraphs 53 through 68 of the proposed amended counterclaims.

**IV.    Prior Art**

Defendants assert that Green and Fleming failed to disclose during the prosecution and reexamination of the '545 Patent three different items that allegedly constitute material prior art.

First, Defendants point to "a marketing brochure issued by American Cyanamid Company, dated 1990, disclosing 'Pyroset TPO' flame retardant chemical and a fabric treatment procedure using Pyroset TPO for treating cotton/nylon blended fabrics, in the United States (the "Pyroset Brochure")." (Defs.' Am. Affirmative Defenses ¶ 54; Defs.' Am. Counterclaims ¶ 70). Second, Defendants allege that, more than one year before the '545 Patent application was filed, Green, and possibly Fleming, through either MF&H and/or Itex, "sold or offered to sell to the United States Army, and/or caused the public use of military uniforms made of flame retardant Kevlar/nylon/cotton blended fabrics that were treated with the treatment process disclosed in the Pyroset Brochure." (Defs.' Am. Affirmative Defenses ¶¶ 65-66; Defs.' Am. Counterclaims ¶¶ 81-82). Third, Defendants point to the fact that the inventors failed to disclose the '805 Smith Patent during the original prosecution of the '545 Patent. (Defs.' Am. Affirmative Defenses ¶ 54; Defs.' Am. Counterclaims ¶ 70). According to Defendants, all of these items were material prior art because they all *inherently meet* the claim limitation in claim 1 of the '545 Patent: that "after exposure to five washes and twenty-four hours emersion in boiling water, the cotton

11

fabrics burn less than 15 cm (6") at cut edges and retain at least 2.0% and no more than 3.0% phosphorous by weight of fabric." (Defs.' Am. Affirmative Defenses ¶¶ 55, 67, 76; Defs.' Am. Counterclaims ¶¶ 71, 83, 92)

In opposition, Plaintiffs state, "[T]here are no facts pled that establish the alleged prior art discloses any phosphorous values relative to the claims (only an unsupported allegation of inherency)." (Pls.' Opp'n at 9). "As there were already references in front of the Examiner describing fabrics, the pleading fails to establish why these three particular references were not cumulative to those that were considered by the Patent Examiner." (Pls.' Opp'n at 11-12).

We first address the Pyroset Brochure and the fabric allegedly sold to the United States Army. Defendants' assertion of materiality appears to be purely based on the fact that the Pyroset Brochure describes treatment with a single-pass process, similar to the process explained in the specification of the '545 Patent. Arguing that this prior art is not material, Plaintiffs stress that the product claims of the '545 Patent do not require any specific number of passes. (Pls.' Opp'n at 12). As discussed above and in the claim construction opinion dated July 20, 2010, the single-pass process set forth in the specification of the '545 Patent is merely one example of a process that can be used to achieve the results set forth in claim 1 of the '545 Patent, but the process itself is not part of the claimed invention. Therefore, merely noting the usage of a single-pass process is insufficient to show why the Pyroset Brochure and the military uniforms supposedly treated with that process would have been considered material and would not have been cumulative to other information considered by the patent examiner. Defendants have not sufficiently alleged materiality with respect to the Pyroset Brochure or the military fabric.

Turning to the '805 Smith Patent, it is clear that this patent was material, as it was a large focus of the PTO during the reexamination proceedings. The issue then turns to whether the

inventors withheld this patent with intent to deceive the PTO, with the first question being when the inventors became aware of the '805 Smith Patent. Defendants state,

> On information and belief, at least Green and Fleming knew about the existence and materiality of the '805 Smith Patent during the prosecution of the '545 Patent, based, in part, on the fact that at least Green and Fleming were aware of and followed "Proban" related patents issued to Albright and Wilson, which includes the '805 Smith Patent, before they filed the application that became the '545 Patent, as set forth in the specification of the '545 Patent.

(Defs.' Am. Affirmative Defenses ¶ 78; Defs.' Am. Counterclaims ¶ 94 (both citing '545 Patent, col. 4, lns. 1-21)). Plaintiffs insist that the inventors did not know about the '805 Smith Patent until 1996, a year after the '545 Patent issued in 1995. (Pls.' Opp'n at 13). Plaintiffs point to Green's deposition testimony, in which he explained that he first became aware of the '805 Smith Patent in August of 1996. (Pls.' Opp'n at 13 (citing Dep. of James Green, April 6, 2009, p. 148, lns. 2-17)). Moreover, according to Plaintiffs, when the inventors eventually learned of the '805 Smith Patent, they initiated the first reexamination to bring the '805 Smith Patent to the attention of the PTO. (Pls.' Opp'n at 13). In their reply, Defendants do not address Plaintiffs' argument that the inventors were simply unaware of the '805 Smith Patent until after the '545 Patent issued. Defendants simply focus on the materiality of the '805 Smith Patent, suggesting that they do not dispute this particular issue, and/or have no evidence to contradict Plaintiffs' assertion. If the inventors learned of the '805 Smith Patent *after* the '545 Patent issued, there could have been no intent to deceive that patent. Even if the inventors were aware of the '805 Smith Patent prior to the issuance of the '545 Patent, Defendants have alleged no factual basis upon which the court should infer that the information was withheld with intent to deceive the PTO.

Therefore, Defendants' motion for leave to file amended answer and counterclaims is denied with respect to the allegations contained in paragraphs 53 through 83 of the proposed

amended affirmative defenses and paragraphs 69 through 99 of the proposed amended counterclaims.

## CONCLUSION

For the foregoing reasons, Defendants' Second Motion for Leave to File Amended Answer and Counterclaims [160] is granted in part and denied in part. The motion is granted with respect to the allegations of inequitable conduct set forth in paragraphs 16 through 36 of the proposed amended affirmative defenses, and Defendants are granted leave to file amended answer and counterclaims containing these allegations of inequitable conduct. The motion is denied with respect to all other allegations of inequitable conduct, as those allegations have not been sufficiently pled.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: July 21, 2010